

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

EDWIN T. MURRAY, JR.,

        Defendant.

**REPORT AND
RECOMMENDATION**
14-CR-6183

## Preliminary Statement

Edwin T. Murray, Jr. (hereinafter "Murray" or "defendant") has been indicted on four counts of possession of cocaine with intent to distribute; use of premises to manufacture, distribute, and use a controlled substance; possession of a firearm in furtherance of a drug trafficking crime; and being an armed career criminal in possession of firearms and ammunition. See Indictment (Docket # 10). Currently pending before the Court is the defendant's motion to post-arrest suppress statements he made during a search of his residence at 54 Miller Street in the City of Rochester and later at the Rochester Public Safety Building. See Defendant's Motion to Suppress Statements (Docket # 17).

By Order of United States District Court Judge Elizabeth A. Wolford, dated December 4, 2014, all pretrial motions were referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)—(B). (Docket # 11). Accordingly, a suppression hearing was held on May 4, 2015. After the hearing both the Government and defense counsel filed

1

supplemental briefs. <u>See</u> Docket ## 26, 30. The following is my Report and Recommendation as to the defendant's suppression motion.

## Findings of Fact

<u>Search of Murray's Residence</u>: On August 20, 2014, Investigator Scott Ferro of the City of Rochester Police Department and other members of an entry team executed a search warrant of 54 Miller Street in the City of Rochester. Hearing Transcript ("Tr.") 4-5. After entering the residence by use of a "battering ram" Investigator Ferro saw the defendant Murray in the front bedroom. Murray was handcuffed and taken into custody while the search was conducted. Tr. 7-8. As the search team was entering the residence, Murray's wife Chris was arriving home after "running an errand." Tr. 54. She was also handcuffed and detained by the police while her home was searched. Tr. 34-35.

Investigator Ferro testified that he participated in the search of the "front bedroom." During the search of the bedroom Murray was seated on the floor. After photographs were taken of the bedroom, Ferro began searching. According to Ferro, as he started to search the bedroom Murray stated "it's under the bed, it's under the bed." Tr. 8-9. Investigator Ferro then looked under the bed and found a shoebox containing, among other items, cocaine. Ferro testified:

> After I found the shoebox, which had what appeared to be crack cocaine inside of it, his wallet was also in there,

2

> he said "it's mine, my wife had nothing to do with it. I told him, I says "hold on a second, relax, we'll talk later, we'll talk to you — I'll talk to you downtown. Just hold on." But he was continuing to talk, tell us where, you know, the drugs are his, my wife has nothing to do with it. So finally I had Officer Least take Mr. Murray outside and have him sit in a police car.

Tr. 9. Ferro denied asking Murray any questions before he made the admissions regarding the location and ownership of the cocaine. Tr. 10.

Statements Made at the Police Station: At the conclusion of the search, Murray was driven to the Rochester Public Safety Building to be interviewed and processed. Upon arrival, Murray was escorted to an interview room and handcuffed to a table. Tr. 11. At approximately 3:00 p.m., Investigator Ferro entered the interview room, introduced himself, took the handcuffs off Murray, and gave him a beverage. Tr. 13. Ferro asked Murray preliminary questions and Murray told Investigator Ferro that he had graduated high school, was not under the influence of alcohol or drugs, and was not injured or ill. Tr. 13-14. Ferro then read Murray his Miranda rights using a standard advice of rights card (Hearing Exhibit 1) issued by the Rochester Police Department. Tr. 14. After reading Murray his rights, Investigator Ferro asked Murray if he understood the rights he had been read, and Murray responded that he did. Tr. 16. Murray then agreed to speak to Investigator Ferro, but first asked to use the restroom. Tr. 16, 39. Officer Least took Murray to the

restroom. Tr. 17-18.

When Murray returned, Investigator Ferro began his questioning of Murray. Tr. 20. Murray told Ferro that he had previously been arrested on a drug charge, and as a result "he was working off a contract with the Rochester Police Department, working for an undercover officer," and he had drugs in his residence in order to complete his contract. Id. Murray told Investigator Ferro that "you can't just hang around with these drug dealers and not have the stuff around." Id. Murray further stated "that his wife had nothing to do with it" and "that she didn't even know it was there." Id. As to a rifle found in the defendant's residence, Murray told Investigator Ferro "that he got [it] off some guy who came knocking on his door." Id.

After Murray gave his oral statements to Investigator Ferro, Ferro reduced to writing Murray's "story" by writing it down on a statement form. Tr. 22. The form (Hearing Exhibit 2) confirmed that Murray had been advised of his Miranda warnings to Murray. After he had finished writing, Ferro read the statement aloud to Murray. Murray asked Ferro to make two changes to the statement and Ferro made the changes. Tr. 22. Once the written statement was finished, both Investigator Ferro and Murray signed the statement form. Tr. 23, 25. Investigator Ferro testified that he did not recall whether he and Murray had spoken about potential criminal

4

charges against Murray's wife. However, Ferro denied ever making any promise to Murray not to charge or arrest his wife with any crime so long as Murray gave a statement to law enforcement. Tr. 27-29.

<u>Testimony of Chris Murray</u>: The defense called Chris Murray, the defendant's wife, as a witness. Mrs. Murray testified that on August 20, 2014, she returned to her home at 54 Miller Street after running an errand with her mother-in-law when she saw officers run into the back door of the residence and break in the door. Tr. 54. She exited her vehicle, and after telling an officer that she lived at 54 Miller Street, the officer took her car keys, closed her car door, took her into the residence, sat her down in the kitchen, and placed her in handcuffs. Tr. 55. Mrs. Murray did not see her husband while he was in their bedroom. She did not believe her husband could see her in the kitchen and she did not alert him to her presence in their home. Tr. 64-65. After the officers searched the house, Mrs. Murray saw her husband leave the residence with the officers, and he kissed her goodbye but they did not speak to each other. Tr. 56, 65. Mrs. Murray was escorted out of the residence, placed in a police vehicle, and transported to the Public Safety Building. Tr. 57.

Upon arriving at the Public Safety Building, Mrs. Murray testified that she was told that when her husband "was finished writing a statement," they would let her leave and she was placed in an interview room alone. Tr. 57, 75. Mrs. Murray sat

5

unrestrained in the interview room for approximately forty-five minutes. Tr. 57. Mrs. Murray recalled that eventually an officer took her to another interview room nearby to see her husband, where she "kissed him, [] got his jewelry and [] left." Tr. 58. Mrs. Murray testified that she was in the room with her husband for only two minutes, and she did not say very much to him aside from telling him not to worry and that everything would be okay. Tr. 70-71.

## Discussion

I. Murray's Statements at 54 Miller Street.

It is well settled that police may not interrogate a suspect who has been taken into custody without first advising him of his Miranda rights. United States v. Newton, 369 F.3d 659, 668 (2d Cir.), cert. denied, 543 U.S. 947 (2004). It is only in the context of a custodial interrogation that a defendant is entitled to be informed of his Miranda rights. Dickerson v. United States, 530 U.S. 428, 434-35, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000); Tankleff v. Senkowski, 135 F.3d 235, 242-43 (2d Cir. 1998). Here, there is no dispute that the defendant was in custody at the time he made statements at 54 Miller Street. Thus, the admissibility of Murray's statements hinges on whether he was interrogated by law enforcement.

The test for determining whether the conduct of law enforcement agents amounted to "interrogation" is whether the words or actions

6

of law enforcement agents "were reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 302, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). The term "interrogation" includes both express questioning or its functional equivalent and includes any "practice that the police should know is reasonably likely to evoke an incriminating response from a suspect." Id. at 300-02. In making this assessment, the Court must consider "the totality of the circumstances of the agents' conduct." United States v. Cota, 953 F.2d 753, 758 (2d Cir. 1992). The determination of whether a statement is likely to elicit an incriminating response "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." Innis, 446 U.S. at 301. However, "Miranda does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." United States v. Hayes, 120 F.3d 739, 744 (8th Cir. 1997) (internal quotations and citations omitted).

Here, I find that the statements made by Murray at 54 Miller Street were spontaneous and not the product of police questioning or its functional equivalent because the police conduct at issue was not reasonably likely to elicit an incriminating response. Though Murray may have felt that the officers' seizure of the drugs found in his bedroom during the search of the residence required an

7

admission in order to exculpate Mrs. Murray from criminal liability, his inculpatory statement was neither coerced nor involuntary, and the choice to make such a statement was his and was not the product of police questioning. None of the officers asked the defendant any questions while they searched the residence, and Investigator Ferro testified that Murray made statements to him which were entirely unprompted by him or any other officer. Additionally, even after Investigator Ferro advised Murray to refrain from speaking, Murray continued to make statements to the officers. Therefore, these spontaneous statements should be admissible. See United States v. Figueroa, 300 F. App'x 93, 95 (2d Cir. 2008) (concluding that statements at issue were not "made in response to express questioning or its functional equivalent" since "[a]ll three statements were made while the officers were going about their routine tasks in conducting a search, securing a crime scene, and making an arrest"); United States v. Mitchell, No. 11-CR-6019, 2012 WL 4325462, at *2 (W.D.N.Y. Aug. 16, 2012) ("While Mitchell may have felt the discovery of drugs and a firearm during the search of the residence deserved an explanation in order to exculpate Ms. Smith from criminal liability, the choice to offer an explanation was his and was not the product of interrogation or its functional equivalent."), adopted by 2012 WL 4324923 (W.D.N.Y. Sept. 20, 2012); United States v. Hemingway, No. 05-CR-6108L, 2007 WL 499470, at *1 (W.D.N.Y. Feb. 13, 2007)

(statements made by defendant seeking to exculpate brother after narcotics found in kitchen during execution of search warrant were spontaneous under <u>Innis</u>). Accordingly, it is my Report and Recommendation that Murray's motion to suppress the statements he made to law enforcement at 54 Miller Street be **denied.**

II. <u>Murray's Statements at the Public Safety Building.</u>

Murray also seeks suppression of the oral and written statements he made at the Rochester Public Safety Building. In an affidavit filed with the Court, Murray stated that Investigator Ferro promised not to prosecute Murray's wife if he signed a statement admitting that the drugs found in his home belonged to him. <u>See</u> Affidavit of Edwin T. Murray, Jr., attached as Exhibit 2 to Defendant's Motion to Suppress (Docket # 17). Murray contends that this threat to arrest his wife constituted impermissible coercion, rendering his confession involuntary. <u>See</u> Defendant's Post-Hearing Submission (Docket # 26) at 4.

"A confession is admissible under the Constitution only if it is made voluntarily." <u>United States v. Orlandez-Gamboa</u>, 320 F.3d 328, 332 (2d Cir. 2003). The prosecution bears the burden of demonstrating that a confession was voluntary. <u>Nelson v. Walker</u>, 121 F.3d 828, 833 (2d Cir. 1997). A confession extracted by physical intimidation or psychological threats may be deemed involuntarily obtained. <u>See, e.g.</u>, <u>Lynumn v. Illinois</u>, 372 U.S. 528, 534 (1963).

9

In making the voluntariness determination, the court should consider the "totality of the circumstances" surrounding the particular interrogation at issue. Arizona v. Fulminante, 499 U.S. 279, 286 (1991). "Relevant factors that should be considered include the accused's age, his lack of education or low intelligence, the failure to give Miranda warnings, the length of detention, the nature of the interrogation, and any use of physical punishment." Campaneria v. Reid, 891 F.2d 1014, 1020 (2d Cir. 1989), cert. denied, 499 U.S. 949 (1991).

The Court will consider Murray's affidavit alleging that Investigator Ferro promised not to prosecute Murray's wife if he signed a statement of confession, but gives it little weight because Murray was not subject to cross-examination. See United States v. Walters, No. 11 CR 683(NG)(RML), 2013 WL 5928509, at *9 (E.D.N.Y. Oct. 16, 2013) ("[defendant] . . . elected not to testify and subject himself to cross-examination, thereby leaving the court without a means to gauge his credibility or the reliability of his assertions [contained in his affidavit] [;] . . . in light of the highly credible testimony of [the agent], I note those instances where [the defendant's] recollection differs from that of [the agent's], but accord the distinctions little weight"); United States v. Wang, No. 11 Cr. 730(PGG), 2013 WL 452215, at *7 (S.D.N.Y. Feb. 5, 2013) ("[a]s an initial matter, while the Court has considered both [defendant's]

10

affidavit and [the agent's] testimony, the latter is entitled to more weight because it was subject to cross-examination") (collecting cases).

The only "coercion" Murray alleges is the alleged promise made by Ferro that if he cooperated and admitted to ownership of the drugs, criminal charges would not be filed against his wife. To be sure, concern that his spouse could be arrested might make Murray fearful, anxious, and upset, but the relevant inquiry is whether the conduct of the police was so overbearing and coercive that any resulting statement was not the product of the defendant's own free will. United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991). Based on the hearing testimony, I find that the circumstances of Murray's interrogation were not so coercive so as to render his post-Miranda statements involuntary. Investigator Ferro, who was subjected to cross-examination at the suppression hearing, testified that he never implied or conditioned his interview of Murray on any agreement to refrain from charging or arresting Murray's wife and I find his testimony on this point to be credible. The testimony of Chris Murray did not elicit facts supporting the claim that promises were made by Ferro or that Murray was coerced into making admissions. By the time Chris Murray was brought into the interview room, the defendant had already signed a statement and there was no discussion between them or with Investigator Ferro about arresting or charging


Mrs. Murray.[1]

In sum, I find that the conduct of Investigator Ferro did not rise to the level of "a coercive and overbearing experience" sufficient to conclude that Murray's statements were not voluntary under the Due Process Clause. United States v. Bye, 919 F.2d 6, 10 (2d Cir. 1990). Therefore, it is my Report and Recommendation that the defendant's motion to suppress the statements he made at the Public Safety Building be **denied.**

## Conclusion

For the foregoing reasons, it is my Report and Recommendation that the defendant's motion to suppress his statements (Docket # 17) be **denied.**

SO ORDERED.

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:   October 26, 2015
         Rochester, New York

---

[1] Even if the evidence suggested that such a promise was made to Murray, that inducement, by itself, would not necessarily render Murray's subsequent statements involuntary. See, e.g., United States v. Wyche, 307 F. Supp. 2d 453, 464 (E.D.N.Y. 2004) ("A threat to a suspect to charge a third party with a crime, a crime that the third party is also plausibly guilty of, does not make that suspect's subsequent confession inadmissible."); United States v. Harris, 613 F. Supp. 2d 1290, 1302 n.15 (S.D. Ala. 2009) ("The mere statement that a family member may be jailed if the accused does not confess does not automatically render a confession involuntary absent a showing that the defendant's will was overborne.") (collecting cases); Hernandez v. Scribner, No. 1:04-CV-05234 LJO JMD HC, 2008 WL 2025146, at *13 (E.D. Cal. May 9, 2008) (promise made regarding custody status of a loved one "does not necessarily render any subsequent confession involuntary").

12

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[1]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. See, e.g., Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:     October 26, 2015
           Rochester, New York

---

[1] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. United States v. Andress, 943 F.2d 622 (6th Cir. 1991), cert. denied, 502 U.S. 1103 (1992); United States v. Long, 900 F.2d 1270 (8th Cir. 1990).